TOWN OF WARREN

v.

Sandra THORNTON–WHITEHOUSE, in her capacity as Chairperson of the Coastal Resources Management Council et al.

Nos. 97–648–Appeal, 97–632–M.P.

Supreme Court of Rhode Island.

Nov. 17, 1999.

Anthony DeSisto, Providence, for Town of Warren.

Andrew M. Teitz for Town of S. Kingston.

Lauren E. Jones, Providence, Michael R. McElroy, Providence, David L. Krech, for Interstate Navigation Co.

William Conley, Jr., E. Providence, for City of East Providence.

Brian A. Goldman, Providence, for C.R.C.M.

Joseph DeAngelis, Providence, for Kirk Dexter et al.

John J. Bolton for RI Marine Trade Association.

Trish K. Jedele for St. of RI.

John B. Lawlor, Jr., Providence, for Sandra Whitehouse.

Present WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

## OPINION

LEDERBERG, Justice.

The central issue in this appeal is whether exclusive jurisdiction over the construction of private, residential, noncommercial boat wharves[1] rests with the Coastal Resources Management Council (CRMC or agency) or whether the Legislature intended to grant to cities and towns some overlapping or concurrent authority over the construction of these facilities. This case came before the Supreme Court on appeal from a Superior Court judgment declaring that the CRMC possesses "exclusive jurisdiction over recreational boating facilities." In appealing the ruling, the town of Warren (Warren or town) argued that it exercises concurrent jurisdiction over these facilities pursuant to its zoning power. To the extent that Warren claims jurisdiction over the construction of residential, noncommercial boat wharves, we disagree.

### Facts and Procedure

In January 1995, Kirk Dexter (Dexter) filed an application with CRMC to construct a boating dock on the coast adjacent to his residential property on the Kickemuit River in Warren, Rhode Island. The CRMC classifies the river as a "Type 2 Low Intensity Use water area" in which residential docks are permitted if they meet certain conditions. Dexter's revised plans for the dock included a 72-foot fixed timber pier, an 8-foot ramp, a 16-foot float, and a 6-foot stairway connecting the landward side of the dock to the upland. The dock's length totaled 102 feet, with steps on either side at the beginning of the dock to allow public access to the shore. The length that the dock would extend beyond mean low water exceeded the standard set forth in CRMC regulations by 12 feet, thereby requiring a variance from the agency.

Between June 27, 1995, and February 13, 1996, seven meetings were held either by the full CRMC or a subcommittee duly appointed to consider the Dexter application. At three of these meetings held at the Warren Town Hall, the agency reviewed the application, received reports of agency staff, and heard testimony from interested members of the public. The agency's staff engineer informed CRMC that "there will be no engineering objection to the issuance of an Assent for all elements of this project." The CRMC staff biologist reported that "there is no biological objection to the proposed project." The Kickemuit River Council, however, objected to the dock and argued that its proximity to other docks would cause congestion and would limit the ability of the public to access the river for swimming, small boating, and shellfishing. The Warren Harbor Management Committee objected on similar grounds and, in addition, argued that the proliferation of docks was restricting its ability to create a harbor-management plan that would preserve the water quality of the river. The Warren Conservation Commission joined in the objections of both of these latter groups.

For purposes of this appeal, the most important objection was made by the solicitor of the town. Dexter's property is located in an R–40 residential zoning district. Under an amendment to the town's zoning ordinance adopted in December 1994, a residential boat dock is permitted in an R–40 district only by a special-use permit. On September 15, 1994, the building official for the town informed CRMC that Dexter had complied with all local rules relating to the proposed dock construction. Dexter, however, had neither sought nor received the special-use permit required by the December amendment to

---

1. The judgment and decision of the trial justice used the term "recreational boating facilities," although the parties described the proposed construction as a "dock." The word generally used in our earlier cases is "wharf." See, e.g., Clark v. Peckham, 10 R.I. 35, 38 (1871). The phrase "recreational boating facilities" describes, in our view, a class that is much broader than the project at issue in this case. We interpret the word "dock" to be synonymous with the word "wharf" and shall use the two words interchangeably.

the zoning ordinance. In a letter dated June 21, 1995, Warren's solicitor informed CRMC that unless Dexter was granted a special-use permit, the town's building official would issue a stop-work order on any dock construction. At a February 13, 1996 CRMC meeting, the town further argued that under CRMC's own regulations, the agency lacked the authority to assent to the construction, absent compliance with local zoning regulations.

At that meeting, the full CRMC approved the Dexter application. On April 19, 1996, the agency issued a written decision in which it made twenty-nine findings of fact, one of which stated that "local approval is not required for the construction and maintenance of dock facilities located within the State of Rhode Island's tidal waters."

In May 1996, Warren filed a complaint, count 1 of which sought judicial review and reversal of CRMC's decision, pursuant to the Administrative Procedures Act, G.L. 1956 § 42–35–15. Count 2 of the town's complaint sought a declaratory judgment, to the effect that the requirement of a special-use permit for dock construction was a valid exercise of Warren's zoning power and that CRMC could not issue a permit for dock construction unless the applicant had complied with local zoning regulations. Judgment entered on December 1, 1997. In respect to count 1, because CRMC had not based its decision on substantial evidence, the case was remanded to CRMC for findings of fact regarding the location of the mean high-water mark and the mean low-water mark. In respect to

count 2, the trial justice declared that CRMC possesses "exclusive jurisdiction over recreational boating facilities."

■ Warren filed a timely notice of appeal and asked the Supreme Court to review and reverse the trial justice's declaratory judgment.[2] Amicus briefs were filed by several interested parties. Interstate Navigation Company, the city of East Providence, and the towns of Bristol, Barrington, and South Kingstown filed briefs in support of Warren. John Harwood, Speaker of the Rhode Island House of Representatives, filed a brief supporting the position of CRMC and Dexter. The Rhode Island Marine Trade Association and the State of Rhode Island joined in the brief of CRMC and Dexter.

Warren and its amici recognize that the Legislature has granted to CRMC the authority to regulate the construction of residential boating facilities in tidal waters. They argued, however, that the Legislature has evinced a clear intention—under the Zoning Enabling Act, G.L.1956 §§ 45–24–27 through 45–24–72, and the Comprehensive Planning and Land Use Act, G.L. 1956 chapter 22.2 of title 45—also to grant municipal governments the authority to regulate construction of residential docks in tidal waters. The town asserted that CRMC's own regulations require that before the agency grants an approval, an applicant must demonstrate that all necessary local approval has been obtained.

In contrast, CRMC and its amici maintained that the CRMC enabling act, G.L.

2. Exercising caution, the town also filed a petition for certiorari on December 19, 1997. The question arises whether this case is properly before us on appeal or on a petition for certiorari. When a party challenges the Superior Court's review of a decision of an administrative agency, such a challenge is properly brought before us on a petition for certiorari pursuant to the Administrative Procedures Act, G.L.1956 § 42–35–16. Thus, if any party had sought review of the trial justice's disposition of count 1 of the complaint, it would have been necessary to file a petition for certiorari. However, no party has

asked this Court to review the trial justice's remand of the case to CRMC for further fact-finding. Instead, only the declaratory judgment has been challenged. Declaratory judgments were first authorized by statute in Rhode Island in 1959, G.L.1956 chapter 30 of title 9, as enacted by P.L.1959, ch. 90, § 1. Since that time, this Court has recognized that the proper method by which one seeks review of a declaratory judgment is by means of an appeal. *Newport Amusement Co. v. Maher,* 92 R.I. 51, 53–54, 166 A.2d 216, 217 (1960). The writ of certiorari was improvidently issued and is dismissed *pro forma.*

1956 chapter 23 of title 46, grants the agency *exclusive* jurisdiction over residential boating facilities. Moreover, CRMC argued that the General Assembly clearly intended that "issues associated with the state's coastal resources * * * required a uniform, integrated statewide network of control and regulation * * * [and] that a fragmented approach to managing and regulating the coastal resources would be detrimental to the health, safety, and welfare of the general public." Thus, CRMC argued, the Legislature has completely occupied the field of regulation of tidal waters and preempted any regulation thereupon by local governments. Further, CRMC asserted, although its regulations do require local approval for some projects, the regulations do not require local approval for a residential boat dock such as the one at issue here. Even if the agency's regulations did require local approval, CRMC alleged that in *Easton's Point Association, Inc. v. Coastal Resources Management Council*, 559 A.2d 633, 636 (R.I.1989), this Court held that the agency may waive such local approval at its own discretion.

### Standard of Review

■ We begin by noting that the sole issue before us is one of statutory interpretation of whether the Legislature has granted concurrent jurisdiction over residential boat wharves to municipalities and to CRMC, or whether the Legislature has reserved exclusive jurisdiction in CRMC. A trial justice's finding concerning statutory interpretation presents a question of law that this Court reviews *de novo. Levine v. Bess Eaton Donut Flour Co.*, 705 A.2d 980, 982 (R.I.1998). In discerning the meaning of a statute, our ultimate goal is to give effect to the purpose of the act as intended by the Legislature. *Matter of Falstaff Brewing Corp.*, 637 A.2d 1047, 1049–50 (R.I.1994).

### Public Trust Doctrine and Riparian Rights

■ After careful review of the statutes at issue in this case, we are persuaded by the arguments of CRMC and its amici. Clearly, CRMC was devised and created by the Legislature to deal with shoreline issues. As we shall discuss *post,* there is some overlap in jurisdiction with respect to upland areas—that is, those areas above the mean high-water mark. But in purely tidal areas beginning at the mean high-water mark, CRMC exercises exclusive jurisdiction. Any system of regulation of tidal land in Rhode Island must be viewed in the context of two ancient and still vital doctrines of the law of this state, namely, the public-trust doctrine and the common-law right of riparian property owners to wharf out. Each of these doctrines limits the authority of municipalities to regulate tidal lands. Although such authority *could* be granted to local governments, in the absence of the Legislature's express statement of its intent to do so, we conclude that municipalities have not been endowed with such authority.

■ Under the public-trust doctrine, "the state holds title to all land below the high water mark in a proprietary capacity for the benefit of the public." *Greater Providence Chamber of Commerce v. State,* 657 A.2d 1038, 1041 (R.I.1995); *Nugent v. Vallone,* 91 R.I. 145, 152, 161 A.2d 802, 805 (1960); *Bailey v. Burges,* 11 R.I. 330, 331 (1876). The state's authority over that land is limited by article 1, section 17, of the Rhode Island Constitution, which provides that the people shall continue to enjoy "the privileges of the shore," including the right to fish, to swim, and to pass along the shore. *See Jackvony v. Powel,* 67 R.I. 218, 227–28, 21 A.2d 554, 558 (1941) (holding that the State Constitution prohibits the state from permitting sections of the shore to be fenced off barring public access). Within those constitutional limits, the state possesses broad power over tidal land. The state may grant tidal land to another, *Greater Providence Chamber of Commerce,* 657 A.2d at 1040, and it may also delegate the authority to regulate that

land on the state's behalf. But before we could conclude that such a delegation has occurred, we would require an express statement of intent by the Legislature to delegate that authority.

■ In the case of CRMC, such express language *is* contained in its enabling act, § 46–23–6(2). The statute specifically states that CRMC is "authorized to approve, modify, set conditions for, or reject" any proposed "development or operation within, above, or beneath the tidal water below the mean high water mark," within certain limits set forth in the statute. *Id.* With its explicit reference to "tidal water below the mean high water mark," the statute absolutely and clearly authorizes the agency to regulate the lands to which the state holds title under the public-trust doctrine.

Our thorough review, however, reveals no such explicit grant of authority to municipal governments in the Zoning Enabling Act or the Comprehensive Planning and Land Use Act. Warren pointed to language in the latter act which states that a municipality is charged with creating policies for the management and protection of "water * * * watersheds, wetlands, aquifers, [and] coastal features," § 45–22.2–6(E). The town further cited provisions of the Zoning Enabling Act indicating that one goal of zoning should be to protect water. *See* G.L.1956 §§ 45–24–29(b)(3); 45–24–30(3)(c); 45–24–33(A)(3). Unfortunately, these statutory exhortations fail to rise to the level of an express statement that municipalities have been granted the power to regulate the tidal waters to which the state holds title.

■ Turning to the second doctrine, it has long been established in Rhode Island that a riparian land owner possesses a common-law right to wharf out. *Nugent,* 91 R.I. at 150, 161 A.2d at 805; *Clark v. Peckham,* 10 R.I. 35, 38 (1871). Under this doctrine, the riparian land owner has the right to construct whatever wharf or dock is necessary to gain access to naviga-

ble waters, as long as such construction does not interfere with navigation or the rights of other riparian land owners. *Nugent,* 91 R.I. at 150, 161 A.2d at 805. As with any aspect of common law, that right is subject to limitation by statute. *Id.* In the past, the Legislature limited this right through the establishment of harbor lines that marked the point beyond which no wharf could extend. *Bailey,* 11 R.I. at 331. Today, it is clear that the Legislature has chosen to limit the right to wharf out by requiring land owners to gain approval from CRMC before constructing a wharf or a dock in tidal waters, § 46–23–6(2). Just as we discern no specific delegation of authority to regulate tidal lands, we ascertain no language in the Zoning Enabling Act or the Comprehensive Planning and Land Use Act that can reasonably be understood as further limiting the common-law right to wharf out. In our opinion, the Legislature would not have placed additional limits on this traditional right without an explicit statement to that effect.

■ Because the Legislature has not explicitly granted to municipalities the authority to regulate tidal lands or the authority to limit the common-law right to wharf out, we hold that CRMC has exclusive jurisdiction over wharves in tidal waters, beginning at the mean high-water mark. We wish to emphasize that this holding in no way limits or restricts the traditional zoning power of municipalities. The CRMC must still defer to local zoning regulation for all projects that extend above the mean high-water mark into the uplands. Thus, if CRMC approves a wharf for a commercial ferry operation, the municipality can still exercise its zoning power to regulate construction of buildings, landscaping, lighting, and any other use of the upland.

Similarly, a municipality still retains its traditional zoning power to regulate the use to which land is put. For example, the proposed dock in the case before us is appurtenant to land that is zoned for residential use. If the land owner were to use

the dock for commercial purposes, perhaps by selling bait to boaters on the river, the town could seek to enjoin that use under its zoning authority. Similarly, if CRMC were to approve an application for construction of a floating restaurant, the town would continue to exercise its traditional authority over such items as liquor licenses or hours of operation. Thus, despite the dire warnings of Warren and its amici, our holding that CRMC has exclusive jurisdiction over tidal waters does not make futile all local efforts at zoning or planning along the coast. Our holding merely recognizes that municipalities are not empowered to enact zoning ordinances aimed solely at the regulation of tidal land.

The parties argued extensively about whether CRMC's regulations require that applicants seeking to construct docks obtain local zoning approval and whether the agency could waive that approval. Because we hold that the town lacks authority to give or withhold approval of the construction of the dock, we need not reach the question of whether the agency has bound itself to act only after such approval has been obtained.

■■■■■ The parties framed the issue before this Court as one of preemption— that is, whether the state had preempted municipal regulation of the construction of residential boat docks. A local ordinance or regulation may be preempted in two ways. First, a municipal ordinance is preempted if it conflicts with a state statute on the same subject. *See State v. Pascale*, 86 R.I. 182, 186–87, 134 A.2d 149, 152 (1957) (local traffic ordinance punishing *any* refusal to comply with order of police officer was preempted by state statute punishing *willful* refusal to comply with police order). *See also* G.L.1956 § 45–6–6. Second, a municipal ordinance is preempted if the Legislature intended that its statutory scheme completely occupy the field of regulation on a particular subject. *See Town of East Greenwich v. Narragansett Electric Co.*, 651 A.2d 725, 729 (R.I.1994) (state statute creating Public Utilities Commission evidenced legislative intent to completely occupy the field of utilities regulation such that local ordinances on the subject were preempted even if they were not disruptive or inconsistent with the state's regulatory scheme). In both situations, preemption only exists in circumstances in which the municipality would have the authority to regulate a particular subject in the absence of state action. Even if CRMC had not been created, Warren would lack authority to regulate tidal lands because that authority would rest with the state. Thus, this is not a genuine case of preemption.

It is worthwhile to note, however, that in cases in which this Court has considered the issue of preemption, we have relied on certain arguments that apply equally to the case at bar. Thus, when determining whether the Solid Waste Management Act preempted local regulation of solid-waste disposal, we noted that

"the pertinent provisions of the [Solid Waste Management] Act recognize that the collection, disposal and utilization of solid waste matter are matters of general concern to the citizens of this state and their welfare; that the problems associated therewith are statewide in scope; and that appropriate governmental processes and support are required so that an effective and integrated statewide network of solid waste management facilities might be planned, financed, developed and operated in an environmentally sound manner for the benefit of the people and municipalities of the state." *Town of Glocester v. R.I. Solid Waste Management Corp.*, 120 R.I. 606, 608, 390 A.2d 348, 349 (1978).

These policy considerations were instrumental in our determination that the Legislature intended to centralize control of solid-waste disposal in a state agency and that local regulation of solid-waste disposal would be inconsistent with the goals of the statute. *Id.* at 609, 390 A.2d at 349.

Similar policy considerations are present in this case. The CRMC's enabling act

sets forth the Legislature's determination that protection and preservation of the state's coastal resources were "essential to the social and economic well-being of the people of Rhode Island," § 46–23–1(b), and that such preservation was "necessary to protect the public health, safety, and general welfare." *Id.* It is clear to us that to permit local regulation of residential boat wharves could undermine these policies. Of the thirty-nine municipalities in Rhode Island, twenty-one could be considered coastal. If these municipalities possessed concurrent jurisdiction over residential boat wharves, each one would be able to impose varying standards for the placement, construction, and appearance of these wharves. Each could insist on an array of different features to promote safety or to protect the environment. Some cities or towns, acting out of parochial interest, might make it more difficult to get approval to construct docks, thereby resulting in unreasonable concentrations of docks in some places and too few docks in others. Rather than promote preservation of coastal resources through coordinated planning, this scheme could result in twenty-one different standards governing the placement of docks. Such an outcome would clearly undermine the legislative goal of protecting and preserving coastal resources.

■ Finally, we wish to make clear that in affirming the judgment of the Superior Court, we are not holding that the CRMC has exclusive jurisdiction over *all* "recreational boating facilities," irrespective of where they are constructed or the nature of their use. Rather, in the case at bar, the only question before this Court was whether the CRMC has exclusive jurisdiction over residential, noncommercial boat wharves that are constructed on tidal land. We have answered that question in the affirmative.

### Conclusion

In summary, we conclude that the Coastal Resources Management Council has exclusive jurisdiction over residential, noncommercial boating wharves. Therefore, the appeal is denied, and the judgment of the Superior Court in respect to count 2 of the complaint is affirmed. The case is remanded to the CRMC for further proceedings consistent with the December 1, 1997 judgment of the Superior Court.